[Civ. No. 14399. Second Dist., Div. Three. Nov. 10, 1944.]

KAY McKOIN, Respondent, v. NOEL ROSEFELT et al., Defendants; W. A. PERILMUTER et al., Appellants.

Sherman & Sherman, Glenn M. Still and F. D. R. Moote for Appellants.

Albert W. Leeds for Respondent.

WOOD (Parker), J.—This is an action to quiet title to real property. The plaintiff held title as trustee under an assignment for the benefit of creditors, and under a grant deed. The defendants Dion and Perilmuter, who are the appellants herein, claimed interests in the property under a second trust deed. The other defendants did not claim any interest in the property. Judgment was for plaintiff. The appeal is from the judgment and the orders denying the motions for a new trial.

The principal questions are: (1) Whether one Rosefelt, who executed the $6,500 note and the second trust deed to secure it, had the right to execute them; (2) whether the defendant Dion, in whose favor the note and second trust deed were executed, gave any consideration for them; and (3) whether defendant Perilmuter, to whom the note and second trust deed were assigned, took them with notice of their invalidity, if they were invalid.

It was the contention of plaintiff at the trial, and is his contention on appeal, that the defendants Dion and Perilmuter had no interest in the property under the second trust deed for the reasons: that Rosefelt, who placed the second trust deed on the property, held the legal title merely as a trustee of a partnership consisting of one Byrd and Rosefelt; that the giving of the trust deed to defendant Dion was without the knowledge of the true owner and was not for any purpose connected with the partnership business; that Rosefelt did not have the right to encumber the property; that no consideration was given to the partnership or to Rosefelt for the trust deed; and that defendant Perilmuter, to whom the trust deed was assigned by an assignee of Dion, took it with notice of its invalidity.

Rosefelt did not claim any interest in the property, but he asserted, as a witness, that the property was his individual property when he made the $6,500 note and second trust deed, to secure it. He asserted further that said note and second trust deed were given to Dion in payment of two notes totaling $3,250 which had been executed previously by Rosefelt in favor of Dion—one note being for $1,600 for cash which Dion lent to Rosefelt for his personal use, and the other one being for $1,650 for repairs on a house (not the one involved here) owned by Rosefelt personally.

Defendant Dion contended that the consideration for the $6,500 note and second trust deed was the cancellation of said notes totaling $3,250.

Defendant Perilmuter, an attorney at law, contended that he took the note (which had been reduced to $3,250) and second trust deed as security for payment of legal services of the value of $1,680 rendered, and to be rendered, by him in behalf of Rosefelt.

The findings of the court were in accordance with the contention of plaintiff.

Appellants contend that the finding of the court that Rosefelt had no right to encumber the property was not supported by the evidence. Robert L. Byrd had established a business of building and selling houses, and the business was known as the Byrd Construction Company. He entered into an oral agreement with one Rosefelt whereby they were to be joint venturers or partners in the business of that company and were to share equally in the profits and losses. A set of books for the company's business was kept, and the signatures of Byrd and Rosefelt were required on the company's checks. Various amounts from the company's funds were paid to each one for his personal use, but those amounts were charged against each one on the books, and the accounts were settled at the end of each year. Byrd testified that the legal title to all the company's real property, about 18 or 20 parcels, was taken in Rosefelt's name for convenience in passing title to purchasers, in that, Byrd, being a general contractor, the right to a mechanic's lien on the property would expire within 30 days instead of 60 days. It also appeared that Rosefelt was a single man and that Byrd was married. The property here involved was purchased in 1939 in the name of Rosefelt. A down payment thereon of $500 was made by Rosefelt from his funds. Approximately $9,000 was borrowed from a loan company, and the payment thereof was secured by a trust deed on the property. In addition to the loan of $9,000, the company spent about $9,000 in building a house upon the property. The company paid about $4,000 for furniture which was placed in the house. The cost of the house and the furniture was about $22,000. When the house was being constructed, it was the intention of Rosefelt to get married and to occupy the house, and to reimburse the company for its expenditures in building and furnishing the house. He did not marry and did not reimburse the company, but he moved into the house in the fall of 1940 and remained there until about June, 1941. The property was for sale during the time he occupied it, and it was listed as property of the company.

On October 15, 1940, while he was occupying the property, and when the company was insolvent and involved in financial troubles, he executed a promissory note for $6,500 and a second trust deed on the property as security for the note. The note and second trust deed, the validity of which is involved herein, were executed without the knowledge of Byrd, in favor of Rosefelt's "old friend," J. Dion. The consideration for those documents, according to the testimony of Rosefelt and Dion, was the cancellation by Dion of two notes totaling $3,250 which had been made by Rosefelt in favor of Dion. Rosefelt had the trust deed recorded. The company paid the utility bills incurred at the property, and paid the monthly payments of $30 on the note which was secured by the first trust deed.

On February 14, 1941, Byrd made an assignment for the benefit of creditors and named one Hummel as trustee, but no schedule of property was attached to the assignment. On February 19, 1941, Byrd and Rosefelt dissolved their business relationship and settled their accounts. On February 28, 1941, Byrd made another assignment for the benefit of creditors and named the plaintiff herein, Kay McKoin, as trustee in place of Hummel. In that assignment the property here involved was listed as a company asset. Hummel, the first trustee, executed the documents necessary to accomplish the transfer from himself to McKoin. On March 10, 1941, Rosefelt signed a statement or rider, attached to the assignment to plaintiff, which was to the effect that he consented to the assignment and that he joined the assignor in conveying all his right, title and interest in the property assigned, and that he agreed to execute all instruments necessary to effect that result. On that same date he executed a grant deed in favor of plaintiff to the property here involved.

Byrd testified that the property here involved was owned by the company. In response to a question on cross-examination as to whether he had an "agreement" with Rosefelt to the effect that the property was to be Rosefelt's property, he said (without objection being made thereto), the "agreement" was, when the property was first purchased, that if it didn't sell and if Rosefelt got married that Rosefelt would take it for his home and would pay the difference between the cost of the property and the $500 he had paid on it; and that when he did not marry they then "agreed" to spend more money and open the property as a model house and sell

it, and they "decided" to build a swimming pool in order to sell the property more readily and get their money out of it.

The accountant for the company, called as a witness for plaintiff, testified that Rosefelt held legal title to real property of the company in approximately twenty instances; that each construction job was set up on an individual sheet or sheets in the ledger of the company; that the first ledger sheet concerning the property here involved was entitled "Rosefelt," which was the same way the ledger sheets for other properties taken in Rosefelt's name were entitled; that the ledger sheets for this property show the amount obtained from the loan company (secured by the first trust deed), the loan of $500 that Rosefelt obtained (for the down payment), and that the construction company repaid that $500 loan; that the ledger shows that the company paid on account of that property $12,072.80 over and above the amount of the first trust deed; that the ledger does not show that Rosefelt reimbursed the company or that he paid anything on the construction costs; that the interest on the first trust deed was paid by the company; and that the property here involved was shown on the books as a company asset.

Rosefelt testified that he held some properties in his name which belonged to the company; that the property here involved was his individual property; that the down payment of $500 was his money and Byrd had no interest in the property; that the company provided funds for building the house, except the funds which came from the first financing; that all expenditures were charged on the books against the property; that Rosefelt had no credits on that sheet; that on the statement signed by Byrd and him in settling their affairs, the property was treated as partnership property; that at the time the assignment was made to plaintiff he believed "the property was in the red" for about $9,000 or $9,500 which was directly chargeable to him, and he would owe Byrd an additional one-half of "that $9,500," and to "offset that" he "agreed to turn the property in to Mr. McKoin on the assignment," and that was the first time there was any agreement between Byrd and him that Byrd "was to have any interest in that property"; that the company advanced the money for him and it was their money; that he was to be charged with it personally; that he had the house for sale from the time he went into it until he came out, and when he did not get married he listed the house with Byrd "to

try to sell it''; that he was not sure who paid the utility bills for that property; and that if the company paid those bills ''they were probably charged'' to him.

A draftsman for the company, called as a witness by defendants, testified that he was the draftsman for the company at the time the plans for the house were drawn, and that he had done private work for Rosefelt; that he drew the plans for the house here involved; and that he was not sure whether it was the company or Rosefelt who paid him for drawing the plans.

Other evidence relating to the right of Rosefelt to encumber the property, which evidence relates also to the question of consideration, is discussed hereinafter.

If the property was the individual property of Rosefelt, he had the right, of course, to encumber it. The court found that he did not have the right to encumber it, and by necessary implication found that it was not his individual property. The evidence was legally sufficient to support the finding that he did not have the right or authority to encumber the property.

Appellants contend further that the finding that no consideration was paid by Dion for the note and second trust deed was not supported by the evidence. Byrd testified that he first learned of the second trust deed in the latter part of October, 1940, when Rosefelt told him that ''he put a second trust deed on the property for $6,500 for our protection,'' and that ''Dion did not even know it was on''; that later when they were settling their accounts after dissolution of the partnership, and Byrd was assisting the trustee in efforts to remove the second trust deed, Byrd made demand on Rosefelt for the second trust deed and Rosefelt refused to surrender it, and said: '' 'After all, you know, Bob, I put it on for us, and after all, you can have your one-half too' ''; that Byrd asked for his one-half at that time, and Rosefelt said ''he would have to get hold of Dion first''; that later Rosefelt said he could not assign a part of the second trust deed to him, but could give him his half only by crediting the $6,500 note with a payment of $3,250 and obtaining from McKoin, the trustee, a new note for $3,250 in favor of Byrd, and a third trust deed on that property made by McKoin in favor of Byrd, securing the new note; that thereafter at a meeting where Rosefelt, Byrd and McKoin were present (Dion not being present) the third trust deed

was made by McKoin, and the credit of $3,250 was written on the $6,500 note by Rosefelt; that the new note and third trust deed in favor of Byrd were not delivered to Byrd, but were retained by McKoin.

The accountant testified that he heard a discussion between Byrd and Rosefelt in which Byrd was "trying to get" Rosefelt to release the second trust deed, and Rosefelt said " 'Bob, I know it is a phoney, but I put it on there for our protection, after all' "; that Rosefelt said, everybody " 'is going to get their money, and this will be $6,500 that we can go back to and build a house on.' "; that he heard several conversations between them about the trust deed, but that was the only time he ever heard Rosefelt call the deed "phoney"; that in October, 1940, (the month when the second trust deed was made), he and Rosefelt were "holding down the office alone at that time" (Byrd was in the east); that material men had stopped deliveries; that they "had over four thousand of drawn checks in the drawer" which there were "no funds in the bank to cover"; that several checks were returned by the bank; and that on two occasions he advanced his own personal money.

McKoin testified that he was present when Rosefelt wrote the credit of $3,250 on the $6,500 note and that McKoin said to Rosefelt, "you better put your initial on there if you are going to sign J. Dion's name"; that Rosefelt signed it and put his initials on it (Dion was not present); that the new note and third trust deed had not been out of McKoin's possession.

Dion was not present at the trial. His deposition, taken under section 2055 of the Code of Civil Procedure, was offered in evidence by plaintiff and was received. According to his testimony he lent $1,600 in cash to Rosefelt about 1937; he never had a bank account; he remodeled a house for Rosefelt in 1938 and his charge was $1,650; he received no principal payments on these debts; he did not file an income tax report until 1941; he did not know why the note was for $6,500 instead of $3,250 until Rosefelt told him it was in that amount because he would have to discount the note since it was secured by a second trust deed. When Rosefelt's deposition was taken he testified that he had the two notes representing the two previous debts, but he refused to state where they were. In response to the question, "Where are

they?'' he said, ''Well, that is my concern, isn't it?'' At the trial he did not produce those notes and testified that they could not be found.

Whether there was a consideration for the note and second trust deed was a question of fact for the trial judge. The evidence was legally sufficient to support the finding that no consideration was paid by Dion for the $6,500 note and the second trust deed.

Another contention of appellants is that the finding that Rosefelt owned no beneficial interest in the property was not supported by the evidence. It appearing that Rosefelt had an interest in the property as a partner, the finding that he owned no beneficial interest therein was erroneous. Concededly, the $6,500 note and second trust deed were not executed for any purpose connected with the partnership affairs, but were executed, according to the testimony of Rosefelt, to obtain the cancellation of two personal notes of Rosefelt. The court having found that Rosefelt did not have the right or authority to encumber the property and that there was no consideration for the $6,500 note and second trust deed, and those findings being supported by the evidence, the further finding that Rosefelt had no beneficial interest in the property, even though erroneous, was not prejudicial.

Another contention of appellants is that the finding, that any consideration paid by defendant Perilmuter for said note was grossly inadequate and he took said note with notice of the invalidity thereof, was not supported by the evidence. After the note and trust deed were executed, Dion delivered the note to Rosefelt, who used it in his settlement with Byrd by reducing it to one-half of its face value and signing Dion's initials and his own initials thereon. Later Dion, without any consideration therefor, assigned the note to Harold Mann, a friend of Dion and Rosefelt. Thereafter, when Rosefelt again requested the note for his personal use, Mann endorsed it, and made a written assignment of the second trust deed to defendant Perilmuter. No consideration was paid to Mann or Dion therefor. Rosefelt, the maker of the note and second trust deed, delivered them to Mr. Perilmuter before maturity of the note. Mr. Perilmuter, a cousin of Rosefelt, testified that his and Rosefelt's ''relations were strained,'' and the first time he ''ever had any legal business'' for Rosefelt was in April, 1941, at which

time he "appeared as his attorney" in a case which "was consummated the latter part of November" of 1941 (that case involved $2,094.75, and Rosefelt was one of five defendants therein. The case was not tried, having been dismissed); that it was the only business he had had for Rosefelt at that time, and Rosefelt owed him $1,680 for his services; that after he completed that case, there "was subsequent work for Rosefelt"; and that the note (of the face value of $3,250) was assigned to him for "services rendered and to be rendered"; that he had not sent Rosefelt a bill for his services; that he made a charge on his books; that he did not give Rosefelt a receipt for payment of his services when he took the note—that he "could not very well" because he "didn't know how much was going to be due" him —there "were other services to be discussed, to be taken out of that"; that any balance, above the amount of his services, he would either turn "over to Mr. Mann, or turn it into court and have Mr. Mann and Mr. Dion fight it out between them." In his deposition he testified that as to any balance, his "surmise would be to return it to Mr. Mann." Mr. Perilmuter testified further that he had telephoned Rosefelt for "the money" for his services, and that Rosefelt "turned over" the note "secured by a deed of trust" which Rosefelt informed him "he had secured from a friend"; that he did not meet Mann "until May of 1942" (Mann assigned the note to him on February 14, 1942); that he did not remember whether Rosefelt told him who the owner of the property was at the time he took the note; that Rosefelt "may have mentioned Mr. McKoin's name"; that he did not get in touch with McKoin; that he made no demand on McKoin to pay the note; that the first thing he did was file notice of default; and that he made no inquiry concerning the fact the interest, payable quarterly, had not been paid for about a year and a half. It appears therefore that some of the circumstances surrounding the acceptance of the note by defendant Perilmuter which should have caused him to inquire concerning the existing equities, if any, as to prior parties are: (1) the note showed on its face that it had been "Adjusted" or reduced to one-half of its original amount (the word "Adjusted," having been written thereon), and no explanation appeared therefor; (2) the note showed on its face that the maker of the note (Rosefelt), had acted as his payee's agent in reducing the amount of the note, having signed the payee's

initials followed by his own initials; and (3) the note showed on its face that the interest, which was payable quarterly, had not been paid for a year and one-half. He made no inquiry at all concerning the history of the note or of the property. The evidence was sufficient to support the finding that any consideration paid by defendant Perilmuter was grossly inadequate and that he took the note with notice of its invalidity. ■ The mere inadequacy of consideration, however, was not sufficient of itself to justify the finding that the note was accepted with notice of its invalidity (*Witty v. Clinch* (1929), 207 Cal. 779, 783 [279 P. 797]; *Imperial Gypsum & Oil Corp.* v. *Chaplin* (1935), 4 Cal.App.2d 109, 113 [40 P.2d 596]), but that fact may be considered with other circumstances in the case upon the question of notice of invalidity. (*Menges* v. *Robinson* (1933), 135 Cal.App. 161, 164 [26 P.2d 882]; *Smith* v. *Armstrong* (1927), 85 Cal.App. 624, 631 [260 P. 347].) That question was one of fact for the trial judge. The findings as to that question, being supported by substantial evidence showing circumstances which required him to make inquiries concerning the validity of the note, cannot be disturbed on appeal.

■ Appellants contend also that plaintiff is not the proper party plaintiff for the reason that he claims to act as trustee for the benefit of creditors and, therefore, should have brought the action as such trustee. Section 367 of the Code of Civil Procedure provides that, "Every action must be prosecuted in the name of the real party in interest, except as provided in section three hundred and sixty-nine of this code." Section 369 of said code provides in part: "An executor . . . or trustee of an express trust . . . may sue without joining with him the persons for whose benefit the action is prosecuted. A person with whom, or in whose name, a contract is made for the benefit of another, is a trustee of an express trust, within the meaning of this section." In addition to holding title to the property as trustee for the benefit of creditors, the plaintiff held the title under a grant deed executed by Rosefelt who had been the owner of record of the legal title. Where the legal title to property is vested in the trustee, it is unnecessary to state in the complaint the means by which plaintiff acquired it, and so far as concerns the defendant he is the real party in interest and may sue in his own name. (20 Cal.Jur. § 12, p. 495; *Thorpe* v. *Story* (1937), 10 Cal.2d 104, 114 [73 P.2d 1194]; *Mitchell* v. *Shoreridge*

*Oil Co.* (1938), 24 Cal.App.2d 382, 384 [75 P.2d 110]; *Cortelyou* v. *Jones* (1901), 132 Cal. 131, 132 [64 P. 119].) In Restatement of Trusts, section 280(h), it was said: ". . . it is unnecessary for the trustee in the pleadings or other proceedings to describe himself as trustee. He can proceed in the action as though he were the owner of the claim which he is enforcing. If he does describe himself as trustee the description is treated as surplusage. . . ." It was not necessary for plaintiff to describe himself as trustee.

A further contention of appellants is that the amendment to the complaint does not state facts sufficient to constitute a cause of action for fraud. It is apparently appellants' argument that fraud is the basic element of plaintiff's cause of action and therefore it was necessary that an averment of fraud appear either in the complaint or the amendment thereto. A cause of action to quiet title pleaded in general form is sufficient to state a cause of action although fraud is one of its constituent elements. (22 Cal.Jur., § 32, p. 152; *Aalwyn* v. *Cobe* (1914), 168 Cal. 165, 167 [142 P. 79].) Furthermore, it does not appear that plaintiff relied upon the theory of fraud in presenting his evidence. He alleged in his complaint that he was the owner of said property and that defendants, without right, claimed an interest therein adverse to plaintiff. By amendment he set forth in detail the allegations upon which he relied to show defendants' claims were without right. The case was not tried upon the theory that fraud was in issue, and the court made no finding as to fraud. The judgment was in accordance with the cause of action stated in the complaint and the amendment. The allegations were sufficient.

Appellants contend further that McKoin is estopped to question the validity of the said note, secured by the second trust deed; that prior to the time Rosefelt executed a deed to the property to plaintiff, the plaintiff knew of the existence of the second trust deed; and that plaintiff recognized the validity of the second trust deed by executing a third trust deed to the property, in favor of Byrd, which third trust deed recited that it was subject to the second trust deed. Appellants argue that "equitable estoppels are founded solely on the theory that to permit the party to maintain the right which he asserts would operate as a legal fraud upon his adversary, or induces the party to change his

position so that he will be pecuniarily prejudiced by the assertion of an adversary claim.'' There was no showing that defendant Perilmuter took the note and second trust deed in reliance upon the statement in the third trust deed that it was subject to the second trust deed. The third trust deed was made by McKoin in favor of Byrd and was not delivered to Byrd, and was not recorded. It appears that defendant Perilmuter did not know who the owner of the property was when he accepted the note and second trust deed, and that he made no inquiry as to ownership of the property. There was no statement by McKoin to defendant Perilmuter concerning the second trust deed or the third trust deed or at all prior to the time defendant Perilmuter accepted the note and second trust deed.

The evidence showed that, prior to the making of the third trust deed, Byrd had been attempting, for the benefit of creditors, to obtain from Rosefelt a release of the second trust deed; that Rosefelt would not release it as security for the whole $6,500 note, but he proposed the third-trust-deed-arrangement which in effect would amount to a release of the second trust deed as security for one-half of the $6,500 note; that Rosefelt would not credit the note with $3,250 unless the third trust deed was made; that McKoin and Byrd considered it would be for the benefit of the creditors if they should obtain at that time, under the third-trust-deed-plan, the release of one-half of the second trust deed encumbrance; and that McKoin considered that since Byrd had previously made the assignment for the benefit of creditors, that if he (McKoin) gave a third trust deed to Byrd that he (McKoin) would in effect be giving the third trust deed to himself. There was no showing that defendant Perilmuter accepted the note and second trust deed in reliance upon any declaration or conduct of McKoin, the trustee; nor was there any showing that any declaration or conduct of the trustee, in making the third trust deed or at all, misled defendant Perilmuter to his prejudice or at all. The contention that plaintiff was estopped cannot be sustained.

■ Another contention of appellants is that the assignment was void for the reason it was not in compliance with sections 3461 to 3466, inclusive, of the Civil Code; and therefore the title given to McKoin pursuant to the assignment was invalid and of no effect. The particulars wherein they assert the assignment fails to comply with those sections are:

that it does not have a list of all properties which were not exempt from execution; that it does not contain the inventory as required by section 3461; that it does not contain an affidavit of the assignor as required by section 3462; and that it was not recorded as required by sections 3463 and 3464. The right to attack an assignment because it is not in compliance with statutory provisions is limited to nonconsenting creditors of the assignor, and to subsequent purchasers and encumbrancers in good faith and for value. (*Garn* v. *Thorwaldson* (1919), 40 Cal.App. 62, 66 [180 P. 9.].) The appellants were not creditors of Byrd or the construction company. According to the findings of the trial court, hereinabove referred to, the appellant Dion was not a creditor of Rosefelt, and appellant Perilmuter was not a purchaser or encumbrancer in good faith. Furthermore, McKoin's title did not rest solely on the assignment. He held title under a grant deed. Plaintiff was entitled to maintain the action.

By reason of the conclusions hereinabove stated, it is not necessary to discuss other contentions of appellants.

(After the commencement of this action and prior to the trial, the property involved herein was sold. Pursuant to a stipulation between plaintiff and appellants the trial court ordered that $3,467.40 of the amount received for the property be impounded to be distributed in accordance with the final judgment.)

The judgment is affirmed, and the appeals from the orders denying the motions for a new trial are dismissed.

Shinn, Acting P. J., and Fox, J. pro tem., concurred.