[No. B113905. Second Dist., Div. Three. Oct. 13, 2000.]

JUDY HASSOLDT et al., Plaintiffs and Appellants, v.
PATRICK MEDIA GROUP, INC., Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part VII.

**COUNSEL**

Law Offices of Harold J. Light and Harold J. Light for Plaintiffs and Appellants.

Law Offices of Michael N. Stafford, Michael N. Stafford; Benedon & Serlin, Douglas G. Benedon and Gerald M. Serlin for Defendant and Appellant.

**OPINION**

**SCHNEIDER, J.\*—**

## I

### FACTUAL BACKGROUND

Plaintiffs and appellants Judy and William Hassoldt (the Hassoldts) own a piece of property in Redondo Beach, on which they operate a preschool called Der Kindergarden. The Hassoldts established a trust (the Yankee Trust), which owns the land and leases it to Der Kindergarden, Inc., a corporation. Neither Der Kindergarden, Inc., nor the Yankee Trust is a party to this litigation.

Defendant and appellant Patrick Media Group, Inc. (Patrick), is an outdoor advertising company. In September of 1986, it purchased the assets and some of the liabilities of another outdoor advertising company, Foster & Kleiser.

In October 1992, a tree located on the Hassoldts' property was severely trimmed. When William Hassoldt discovered the tree had been trimmed, he contacted Daniel Voorhees, the employee of Patrick in charge of Patrick's tree-cutting activities. Ultimately, Patrick denied it was responsible for cutting the tree. The Hassoldts suspected Patrick had trimmed the tree on their property to better expose its outdoor billboard.

The Hassoldts filed a complaint against Patrick which contained multiple causes of action. The gravamen of the Hassoldts' complaint was that Patrick had tortiously trimmed their tree. Following a trial by jury, the Hassoldts were awarded $130,000 in compensatory damages and $150,000 in punitive

---

*Judge of the Los Angeles Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

damages. (The jury's award will be discussed in greater detail, *post.*) Both the Hassoldts and Patrick have appealed timely from the judgment.

II

## THE HASSOLDTS' SPOLIATION OF EVIDENCE CAUSES OF ACTION

### *Procedural Background*

The original complaint filed by the Hassoldts contained five causes of action: trespass, nuisance, conversion, intentional infliction of emotional distress and negligent infliction of emotional distress. In a third amended complaint the Hassoldts added causes of action for intentional and negligent spoliation of evidence. The gravamen of these new causes of action was that Patrick destroyed records and photographs relating to its tree-cutting activities.[1]

The jury was given instructions relating to the Hassoldts' causes of action for trespass; negligence; nuisance; conversion; negligent spoliation of evidence; intentional spoliation of evidence, as well as spoliation damage instructions. The jury was also instructed on the Hassoldts' intentional infliction of emotional distress cause of action.[2]

Four special findings were submitted to the jury. Specifically, the jury was asked whether it found "by a preponderance of the evidence defendant Patrick Media Group, Inc. responsible for damag[ing] Plaintiffs' tree"; whether it found "by a preponderance of the evidence that defendant Patrick Media Group, Inc. is liable for spoliation of evidence"; whether it found "by clear and convincing evidence that defendant acted with oppression or malice in damaging the tree"; and whether it found "by clear and convincing evidence that defendant acted with fraud, oppression or malice in spoliating

---

[1]Before 1993, Patrick's tree-cutting records consisted of a one- or two-page compilation of the locations at which trees were cut and before-and-after pictures of each tree cut. Before 1993, neither the tree-trimming lists nor the before-and-after photographs were destroyed. After Patrick was contacted by the Hassoldts' attorney concerning the cutting of trees, Patrick's representative (Voorhees) looked at these records. In June 1993, after receiving several letters from the Hassoldts' counsel, Patrick changed his record keeping procedure. Specifically, in June of 1993, Patrick made the decision to begin throwing away the before-and-after photographs and the tree trim lists. Additionally, under Patrick's new procedure, it retained the monthly summaries and before-and-after pictures for tree cuttings for only a 12-month period. Voorhees testified that the destruction of the October 1992 records (the records that would be germane to the present case) occurred in or about the second week of November 1993, which was weeks after Patrick was served with a summons and complaint in this action.

[2]A nonsuit was granted on the Hassoldts' cause of action for negligent infliction of emotional distress.

evidence." The jury answered all four of these questions in the affirmative. In addition to the special findings, the jury returned a general verdict awarding $130,000 in damages to the Hassoldts. This verdict form did not indicate the cause or causes of action which formed the basis of the damage award.

The jury also returned a second verdict form which stated: "We, the jury in the above entitled action, having previously found Defendant Patrick Media Group, Inc. acted with fraud, oppression or malice in spoliating evidence now award punitive damages in the amount of $150,000." The jury was apparently presented with no verdict form that gave it the option of awarding punitive damages on any of the Hassoldts' other causes of action.

## Discussion

As stated, the jury was specifically requested to determine whether Patrick had spoliated evidence.[3] Moreover, the jury's award of punitive damages related only to the Hassoldts' spoliation claim. Based on *Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1 [74 Cal.Rptr.2d 248, 954 P.2d 511],[4] Patrick contends the judgment cannot stand. Patrick also contends *Cedars-Sinai* should be retroactively applied to this case. We agree with both of Patrick's contentions.

In *Cedars-Sinai,* the court specifically held "that there is no tort remedy for the intentional spoliation of evidence by a party to the cause of action to which the spoliated evidence is relevant, in cases in which, as here, the spoliation victim knows or should have known of the alleged spoliation before the trial or other decision on the merits of the underlying action." (*Cedars-Sinai Medical Center v. Superior Court, supra,* 18 Cal.4th at pp. 17-18, fn. omitted.)[5] While the court acknowledged "that the intentional destruction of evidence should be condemned" (*id.* at p. 8), it refused to create a tort remedy for such destruction.

The court's decision was based on its conclusion that nontort remedies existed to rectify the intentional destruction of evidence by a party. These remedies included permitting the trier of fact to draw an unfavorable evidentiary inference against the party who destroyed the evidence (Evid. Code,

---

[3] The jury was not asked to determine whether the spoliation of evidence was intentional or negligent.

[4] *Cedars-Sinai* was decided after the trial in this case and while the appeal was pending.

[5] There is no question in the present case that the Hassoldts knew about Patrick's alleged spoliation of evidence before the trial of this case commenced. Indeed, as stated, the Hassoldts moved to amend their complaint to add spoliation causes of action approximately one year before the trial of this case commenced.

§ 413; BAJI No. 2.03); issue, evidentiary, terminating and monetary sanctions for destroying evidence that should have been produced during discovery (Code Civ. Proc., § 2023); State Bar disciplinary proceedings against any lawyer participating in the spoliation of evidence; and criminal penalties (Pen. Code, § 135). The court's disinclination to create a tort remedy for spoliating evidence was also based, in part, on the "uncertainty of the fact of harm in spoliation cases." (*Cedars-Sinai Medical Center v. Superior Court, supra,* 18 Cal.4th at p. 13.)

The Hassoldts do not, nor could they, dispute the holding in *Cedars-Sinai.* Rather, they argue that *Cedars-Sinai* should not be applied retroactively because "the parties have already gone through a trial when the tort of spoliation was recognized by California courts . . . ." As a fallback position, the Hassoldts argue that "even if an exception to retroactivity were deemed not to apply in this case, the Court should treat the jury's award (to the extent, if at all it applies to the destruction of evidence) as a *de facto* sanction for Patrick's outrageous behavior. Otherwise, the innocent parties in this proceeding, plaintiffs (not to mention the trial court), face the burden of yet another trial, while the clear wrongdoer, Patrick, has yet another opportunity to ratchet up the costs to plaintiffs and perhaps, with the passage of time, escape some of the punishment it so richly deserves." We find neither these nor the Hassoldts' other arguments relating to retroactivity to be persuasive.[6]

■ "The general rule is that judicial decisions are given retroactive effect." (*Camper v. Workers' Comp. Appeals Bd.* (1992) 3 Cal.4th 679, 688 [12 Cal.Rptr.2d 101, 836 P.2d 888].) "Several factors are relevant in determining whether an exception to the general rule of retroactivity is warranted, including: 'the reasonableness of the parties' reliance on the former rule, the nature of the change as substantive or procedural, retroactivity's effect on the administration of justice, and the purposes to be served by the new rule. [Citations.]' (*Woods* [*v. Young* (1991)] 53 Cal.3d [315,] 330 [279 CalRptr. 613, 807 P.2d 455].)" (*Camper v. Workers' Comp. Appeals Bd., supra,* 3 Cal.4th at p. 688.)

■ With respect to the parties' reasonable reliance on the existence of the tort of spoliation of evidence, we observe that, before *Cedars-Sinai,* the Supreme Court had never issued a definitive decision on the subject. In that regard, this case is much like the decision in *Newman v. Emerson Radio Corp.* (1989) 48 Cal.3d 973 [258 Cal.Rptr. 592, 772 P.2d 1059], in which the

---

[6]The Hassoldts also advanced the novel proposition that "Even If the Court Finds That *Cedars-Sinai* Must Be Applied Retroactively, This Court Should Allow the Judgment to Stand as a De Facto Sanction." We reject this argument as well.

Supreme Court held that its decision in *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654 [254 Cal.Rptr. 211, 765 P.2d 373] was to be given full retroactive effect.[7] In *Newman* the court stated: "Because the relevant portion of *Foley* did not address an area in which this court had previously issued a definitive decision, from the outset any reliance on the previous state of the law could not and should not have been viewed as firmly fixed as would have been the case had we previously spoken. (Compare *Moradi-Shalal* [*v. Fireman's Fund Ins. Companies* (1988)] 46 Cal.3d 287 [250 Cal.Rptr. 116, 758 P.2d 58].) Even if one views *Foley* as breaking new and unexpected ground, a point we do not concede, it did so in an indisputably unsettled area. . . . The cases were not in agreement as to the appropriate standards permitting recovery of tort damages, leading to uncertainty which was reflected in the variety of Court of Appeal analyses as well as in confusing pleadings in the trial courts." (*Newman v. Emerson Radio Corp., supra,* 48 Cal.3d at pp. 986-987.)

The fact that the Supreme Court had granted a hearing in *Cedars-Sinai* almost a year before this case went to trial also argues against any reasonable belief in the continued existence of spoliation of evidence as a tort remedy. As the court in *Newman* stated: "Although we did not decide *Foley* until December 1988, our decision to grant review in January 1986 put litigants on clear notice of the possibility that we might decline to accept *Cleary*'s [*Cleary v. American Airlines, Inc.* (1980) 111 Cal.App.3d 443 [168 Cal.Rptr. 722]] substantial extension of traditional common law principles in the employment law area and that the state's highest court intended to decide the issue rather than leave it to the decisions of the intermediate appellate courts." (*Newman v. Emerson Radio Corp., supra,* 48 Cal.3d at p. 987, fn. 7.)

Additionally, as was the case with *Foley*, retroactive application of the *Cedars-Sinai* decision will not divest the Hassoldts of any property or contract right, nor, as we will explain below, will it leave them without any remedy.

Finally, applying *Cedars-Sinai* retroactively will not unduly burden the administration of justice. The cause of action can be stricken from any complaint in a case that has not yet gone to trial[8] and damages based on spoliation of evidence can be overturned in any case now pending on appeal,

---

[7]In *Foley* the court held, inter alia, that "an employee may not obtain tort relief for breach of the implied covenant of good faith and fair dealing in an employment contract; the covenant is a contract term and relief for its violation accordingly is limited to contract damages." (*Newman v. Emerson Radio Corp., supra,* 48 Cal.3d at p. 976.)

[8]Of course, the trial court would be free to impose any appropriate nontort sanction if it found the defendant had spoliated evidence.

where it is clear from the judgment or special verdict that such damages were based on a spoliation cause of action.[9]

### The Impact of a Retroactive Application of Cedars-Sinai on the Present Case

Our conclusion that *Cedars-Sinai* must be given full retroactive effect leads to the inescapable conclusion that, to the extent the Hassoldts were awarded damages—both compensatory and punitive—based on their causes of action for spoliation of evidence, that award must be set aside. The difficulty presented by this case is that the jury's $130,000 compensatory damage award was based on a general verdict, i.e., the jury was not asked to specify on which cause or causes of action the award was based.

Patrick contends that the $130,000 compensatory damage award was exclusively for attorney's fees and costs incurred by the Hassoldts by reason of Patrick's spoliation of evidence. Patrick bases this contention on the following facts:

1. "$130,000 was *precisely* the amount requested by Plaintiffs' counsel in his closing argument as attorney's fees and costs for the spoliation cause of action." (Appellant's brief.)

2. The court informed the jury that attorney's fees could be recovered as damages in a spoliation cause of action;

3. The jury then asked for a rereading of plaintiff William Hassoldt's testimony concerning the amount of attorney's fees and costs incurred;

4. That within an hour or two after receiving a transcript of (William) Hassoldt's testimony, the jury returned its $130,000 verdict;

5. That there was no evidence the Hassoldts suffered any other kind of damage. (The Hassoldts strenuously disagree with the latter contention.)

While it may be Patrick's claim that the $130,000 awarded as compensatory damages represented the attorney's fees and costs incurred in connection with the Hassoldts' spoliation causes of action, we do not know that for a fact and we will not speculate in order to reach that result. It is clear,

---

[9]Even though tort damages based on spoliation of evidence could no longer stand, if the Court of Appeal concluded the defendant's spoliation of evidence infected the trial it could order a new trial. Once the case was returned to the trial court, that court could fashion any nontort remedy it chose in order to rectify the spoliation of evidence.

therefore, that the judgment must be reversed and the case remanded for a new trial. The question is what issue or issues should be retried.

Although the Hassoldts may not recover any damages—compensatory or punitive[10]—on their now abolished spoliation causes of action, we reiterate the fact that their complaint contained other causes of action, namely, trespass, conversion, and negligence. If, therefore, no error existed with respect to the liability phase of the trial, we would reverse for a new trial on the issue of damages only. The fact is, however, that the liability phase of the trial was infected with error. Specifically, as will be discussed in more detail below, we have concluded the trial court erroneously admitted into evidence the testimony of Fred Johnson. Accordingly, the case must be remanded for a new trial on both the issues of liability and damages on all of plaintiffs' remaining causes of action except their now abolished spoliation claim.

III

FRED JOHNSON ISSUES

*Introduction*

On appeal, Patrick contends the court prejudicially erred with respect to admitting the testimony of Fred Johnson. Specifically, Patrick contends the court erred by admitting Johnson's testimony that he trimmed trees for Patrick, since that testimony was false; that testimony regarding Johnson's tree-trimming activities unrelated to the tree on the Hassoldts' property was improperly admitted under *People v. Ewoldt* (1994) 7 Cal.4th 380 [27 Cal.Rptr.2d 646, 867 P.2d 757]; that the court prejudicially erred by not excluding Johnson's testimony under Evidence Code section 352; and the trial court erred by not conducting a preliminary fact hearing relating to the admissibility of Johnson's testimony.

*Facts Applicable to the Fred Johnson Issues*

Since Fred Johnson lived in Las Vegas and was unavailable to appear at trial, excerpts from his deposition were read to the jury. Johnson testified that from 1982 to 1986 he was a bill poster and tree trimmer for Foster & Kleiser, Patrick's predecessor. In 1986 he stopped posting bills but continued to trim trees; he did that until 1988. Johnson was still cutting trees when

---

[10]The punitive damage award of $150,000 must be reversed because it is clear that that award was based on Patrick's spoliation of evidence. Indeed, the punitive damage verdict form submitted to the jury permitted an award of punitive damages on only the spoliation causes of action.

Foster & Kleiser sold its business to Patrick and did so for two years after that.

Johnson did his tree cutting in the early morning and on weekends. He asked property owners for consent to trim their trees on only about 10 to 20 percent of his jobs. Cutting trees without the owner's consent continued after Patrick became owner of the business. Johnson testified he would not always try to obtain the property owner's consent to trim trees because of the time involved in obtaining such consent. As much as 80 to 90 percent of the trees Johnson trimmed were located on property that did not belong to his employer.

There were many occasions when Johnson would not admit he was working for the company. It was very common for there to be "close call[s]," i.e., being caught while trimming someone else's trees. On some of these "close calls," Johnson would lie about the identity of his employer. If an owner complained about his tree being trimmed, Johnson would be sure to trim the tree the next time when the owner was not around. Johnson testified that on some occasions he trimmed trees below the billboard sign level. On other occasions, he would remove a whole tree or poison a tree. He did this when he worked for Foster & Kleiser and later for Patrick.

When Patrick purchased the business from Foster & Kleiser, no new guidelines were instituted requiring consent of the owner before trees were trimmed. He was rehired as a bill poster, a job he performed for approximately two years. He never cut trees during this period time. When he trimmed trees and did not have the owner's consent, he did not know whether someone else at the company had obtained consent. It was his belief, however, that there were many occasions where no consent was obtained.

### Discussion

As stated, Patrick objected to the admission of Johnson's testimony on a number of different grounds. One of these grounds was that Johnson's testimony concerning his prior, nefarious tree trimming activities on behalf of Patrick did not contain "the striking degree of [similarity] that would have been necessary between those acts and the tree trimming at issue in order to have made the testimony admissible under Evidence Code § 1101 . . . ." Patrick contends such "striking degree of [similarity]" was required because "the primary purpose for which Plaintiffs sought to introduce this evidence was to prove the *identity* of the party that trimmed Plaintiffs' tree . . . ." In making this contention, Patrick relies on two criminal cases—*People v.*

*Ewoldt, supra,* 7 Cal.4th 380 and *People v. Balcom* (1994) 7 Cal.4th 414 [27 Cal.Rptr.2d 666, 867 P.2d 777].

In *Ewoldt,* while discussing the degree of similarity required for the admission of prior uncharged conduct under Evidence Code section 1101, subdivision (b), the court stated: "The greatest degree of similarity is required for evidence of uncharged misconduct to be relevant to prove identity. For identity to be established, the uncharged misconduct and the charged offense must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts. [Citation.] 'The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.' [Citation.]" *(People v. Ewoldt, supra,* 7 Cal.4th at p. 403.)

██ The Hassoldts, on the other hand, question the application of these criminal cases to a civil case[11] and, in any event, claim Johnson's testimony was admissible on the issues of intent, motive and lack of mistake or accident.

We have concluded Patrick is correct in its assertion that Fred Johnson's testimony was admitted for the purpose of establishing Patrick's identity as the entity responsible for cutting the Hassoldts' tree. We have also concluded, based on *Ewoldt,* that Johnson's testimony was not admissible on the issues of intent, motive and lack of mistake or accident. Accordingly, the trial court prejudicially erred by admitting Johnson's testimony.

██ As stated above, in order for uncharged conduct to be admissible on the issue of identity, "the uncharged misconduct and the charged offense must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts. [Citation.] 'The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.' [Citation.]" *(People v. Ewoldt, supra,* 7 Cal.4th at p. 403.) Simply stated, Johnson's testimony did not describe prior tree trimming activity on the part of Patrick that was so "unusual and distinctive" as to support the inference that Patrick trimmed the Hassoldts' tree. Indeed, as the trial court pointed out, "cutting down trees ain't that unique."

Nor, as the Hassoldts contend, was Johnson's testimony admissible on the issue of intent, motive or lack of mistake or accident. In *People v. Ewoldt, supra,* 7 Cal.4th 380, the court stated:

---

[11]It does seem clear that the principles enunciated in *Ewoldt* are as applicable to a civil case involving the admissibility of prior uncharged acts as they are to a criminal case involving the same issues. *(Brown v. Smith* (1997) 55 Cal.App.4th 767, 790, fn. 15 [64 Cal.Rptr.2d 301] ["[t]he same evidentiary rules apply in both civil and criminal case[s] concerning evidence of other uncharged misconduct. [Citation.]"].)

"This distinction, between the use of evidence of uncharged acts to establish the existence of a common design or plan as opposed to the use of such evidence to prove intent or identity, is subtle but significant. Evidence of *intent* is admissible to prove that, if the defendant committed the act alleged, he or she did so with the intent that comprises an element of the charged offense. 'In proving intent, the act is conceded or assumed; what is sought is the state of mind that accompanied it.' (2 Wigmore[,Evidence], (Chadbourn rev. ed. 1979) § 300, p. 238.) For example, in a prosecution for shoplifting in which it was conceded or assumed that the defendant left the store without paying for certain merchandise, the defendant's uncharged similar acts of theft might be admitted to demonstrate that he or she did not inadvertently neglect to pay for the merchandise, but rather harbored the intent to steal it.

"Evidence of a common design or plan is admissible to establish that the defendant committed the *act* alleged. Unlike evidence used to prove intent, where the act is conceded or assumed, '[i]n proving design, the act is still undetermined . . . .' (2 Wigmore, *supra*, (Chadbourn rev. ed. 1979) § 300, p. 238.) For example, in a prosecution for shoplifting in which it was conceded or assumed that the defendant was present at the scene of the alleged theft, evidence that the defendant had committed uncharged acts of shoplifting in a markedly similar manner to the charged offense might be admitted to demonstrate that he or she took the merchandise in the manner alleged by the prosecution.

"Evidence of *identity* is admissible where it is conceded or assumed that the charged offense was committed by someone, in order to prove that the defendant was the perpetrator. For example, in a prosecution for shoplifting in which it was conceded or assumed that a theft was committed by an unidentified person, evidence that the defendant had committed uncharged acts of shoplifting in the same unusual and distinctive manner as the charged offense might be admitted to establish that the defendant was the perpetrator of the charged offense. (2 Wigmore, *supra*, (Chadbourn rev. ed. 1979) § 410, p. 477.)" (*People v. Ewoldt, supra,* 7 Cal.4th at p. 394, fn. 2.)

We interpret the above quoted language from *Ewoldt* to mean that where the identity of the actor is in dispute and the uncharged misconduct fails to satisfy the stringent "so unusual and distinctive as to be like a signature" standard enunciated in *Ewoldt*, the uncharged conduct is not admissible on such issues as intent, motive or lack of mistake or accident—all of which issues presume the identity of the actor is known. Indeed, it would make no sense to admit evidence of uncharged misconduct on the issue of intent, motive or lack of mistake or accident where the identity of the actor is not

yet determined. Stated otherwise, it would not be relevant to inquire into the issues of intent or motive until it is established the defendant is the person or entity whose motive or intent is at issue.

In their petition for rehearing, the Hassoldts contend it would invite "absurd results" if "any defendant charged with wrongdoing in which intent is an essential element could exclude evidence of prior similar wrongdoing that would otherwise be admissible simply by challenging its own identity as the wrongdoer." We do not agree. If, in a case unlike the present one, the trial court perceives there is no real issue of identity, it may admit the evidence of uncharged misconduct on such issues as intent or motive. But, where, as here, the identity of the actor is a real issue, we conclude, for the reasons stated above, the evidence may not be admitted on these issues unless it satisfies the stringent "so unusual and distinctive as to be like a signature" standard.

In sum, we conclude Fred Johnson's testimony was improperly admitted at trial and, therefore, the judgment in this case must be reversed and the matter remanded for a new trial on the issues of liability and damages on the Hassoldts' remaining causes of action for trespass, conversion and negligence. Our conclusion that Johnson's testimony was improperly admitted makes it unnecessary for us to address Patrick's other claims of error relating to Johnson.[12]

IV

THE TRIAL COURT IMPROPERLY INSTRUCTED ON THE MEASURE OF DAMAGES APPLICABLE TO THE TRIMMING OF THE SUBJECT TREE

The trial court read to the jury two instructions (BAJI Nos. 14.20 & 14.21), both of which related to damage caused to personal property. It was error to give these instructions. ■ The usual measure of damages in a case involving damage to a tree is the difference between the value of the real property before and after the injury. (*Altpeter v. Postal Telegraph-Cable Co.* (1917) 32 Cal.App. 738, 741 [164 P. 35].) There are several corollaries to this general rule. First, an alternative measure of damages is the cost of restoring the property to its condition prior to the injury. (*Heninger v. Dunn* (1980) 101 Cal.App.3d 858, 862 [162 Cal.Rptr. 104].) "Courts will normally not award costs of restoration if they exceed the diminution in the value of

---

[12]Patrick also claims the court unduly restricted the examination of one of its witnesses, Charles Thompson. Based on the record that has been presented to us, we find no abuse of discretion with respect to the court's ruling relating to Thompson's testimony. Our ruling does not preclude the trial court, on retrial, from reexamining the permissible scope of Thompson's testimony.

the property; the plaintiff may be awarded the lesser of the two amounts." (*Ibid.*) Stated otherwise, "a recovery for diminution in value can never exceed the value of the land prior to the injury." (*Id.* at p. 863.)

Second, "[t]he rule precluding recovery of restoration costs in excess of diminution in value is, however, not of invariable application. Restoration costs may be awarded even though they exceed the decrease in market value if 'there is a reason personal to the owner for restoring the original condition' [citation], or 'where there is reason to believe that the plaintiff will, in fact, make the repairs' [citation]." (*Heninger v. Dunn, supra,* 101 Cal.App.3d at p. 863.)

Third, "[i]f [the] restoration of the land to a reasonable approximation of its former condition is impossible or impracticable, the landowner may recover the value of the trees or shrubbery, either as timber or for their aesthetic qualities, again without regard to the diminution in the value of the land. [Citations.]" (*Heninger v. Dunn, supra,* 101 Cal.App.3d at p. 865.)

Fourth, "[c]ourts have stressed that only *reasonable* costs of replacing destroyed trees with identical or substantially similar trees may be recovered. [Citations.]" (*Heninger v. Dunn, supra,* 101 Cal.App.3d at p. 865.)

On retrial, the trial court should instruct on the issue of compensatory damages in the manner consistent with the foregoing principles. ■ There remains for discussion the issue of whether the Hassoldts are entitled to exemplary damages if they prove their tree was damaged by Patrick.[13]

Civil Code section 3346 provides in pertinent part: "For wrongful injuries to timber, trees, or underwood upon the land of another, or removal thereof, the measure of damages is three times such sum as would compensate for the actual detriment . . . ." Code of Civil Procedure section 733 provides: "Any person who cuts down or carries off any wood or underwood, tree, or timber, . . . or otherwise injures any tree or timber on the land of another person, . . . is liable to the owner of such land, . . . for treble the amount of damages which may be assessed therefor, in a civil action, in any Court having jurisdiction." These sections must be "treated as penal and punitive" (*Baker v. Ramirez* (1987) 190 Cal.App.3d 1123, 1138 [235 Cal.Rptr. 857])

---

[13]We observe that in the Hassoldts' cross-appeal, they contend the trial court erred by permitting the jury to award punitive damages solely on the spoliation causes of action. We agree. Punitive damages may also be awarded, if appropriate, on the Hassoldts' causes of action for conversion (*Cyrus v. Haveson* (1976) 65 Cal.App.3d 306, 316 [135 Cal.Rptr. 246]); trespass (*Donnell v. Bisso Brothers* (1970) 10 Cal.App.3d 38, 44 [88 Cal.Rptr. 645]); and nuisance (*Hutcherson v. Alexander* (1968) 264 Cal.App.2d 126, 128 [70 Cal.Rptr. 366, 38 A.L.R.3d 636]).

and "must be construed together" (*Swall v. Anderson* (1943) 60 Cal.App.2d 825, 829 [141 P.2d 912]).

In *Marshall v. Brown* (1983) 141 Cal.App.3d 408, 418-419 [190 Cal.Rptr. 392], the court stated: "Both plaintiff and defendants concur on appeal that statutory damages and punitive damages arising out of the same cause of action are not mutually exclusive. 'The fact that such a statutory penalty [treble damages] . . . is imposed for a particular wrongful act does not preclude recovery of punitive damages in a tort action where the necessary malice or oppression is shown . . .' (4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 849, p. 3143.) Case authority is to the same effect. In *Greenberg* v. *Western Turf Assn.* (1903) 140 Cal. 357 [73 P. 1050], the Supreme Court authorized both punitive damages, under Civil Code section 3294, and a statutory penalty of $100 in addition to actual damages. The court there distinguished between punitive damages that depend upon a showing of malice or oppression of the plaintiff, and a penal provision awarded to the plaintiff because a 'law has been violated and its majesty outraged.' [Citation.]"

"However, due to the penal nature of these provisions, the damages should be neither doubled nor tripled under section 3346 if punitive damages are awarded under section 3294. That would amount to punishing the defendant twice and is not necessary to further the policy behind section 3294 of educating blunderers (persons who mistake location of boundary lines) and discouraging rogues (persons who ignore boundary lines). [Citation.]" (*Baker v. Ramirez, supra*, 190 Cal.App.3d at pp. 1138-1139.)

Based on the foregoing, if, on retrial, the jury finds Patrick responsible for damaging the Hassoldts' tree and also finds Patrick's conduct was engaged in fraudulently, oppressively or maliciously, the jury should be permitted to determine, under proper instruction, the punitive damages to which the Hassoldts are entitled. The Hassoldts may then elect to have a judgment entered that reflects either the court's trebling of the compensatory damage awarded by the jury or the compensatory and punitive damages awarded by the jury. (*Marshall v. Brown, supra*, 141 Cal.App.3d at p. 419.)

Several additional comments are in order. At the punitive damage phase of the trial, Patrick offered to stipulate that its net worth was $200 million and the trial court apparently accepted that figure. In their cross-appeal the Hassoldts claim that the trial court erred by precluding them from proving Patrick's net worth was substantially greater. We conclude this issue to be a "tempest in a teapot." Given (i) the potential range of compensatory

damages in this case and (ii) the fact that punitive damages must bear a reasonable relationship to compensatory damages, whether Patrick's net worth is $200 million or a higher amount would not appear to make much difference. As the trial court observed: "I would think that $200 million figure would certainly give this jury plenty of evidence upon which to fix a reasonable amount of punitive damages. They have to be reasonable in light of 130,000 verdict." We agree with this statement and, interestingly, so did the Hassoldts' counsel. Indeed, the fact the jury awarded $150,000 in punitive damages on the Hassoldts' now abolished spoliation claim underscores the fact that $200 million in net worth will serve as a more than sufficient basis for any possible punitive damage award in this case. On retrial, if punitive damages become an issue, the jury should be informed Patrick's net worth is $200 million.

We also observe that, on appeal, the Hassoldts claim that the trial court erred by permitting the Patrick employee who testified at the punitive damage phase of the trial to state that Patrick was no longer in the billboard business. We are unable to state that such testimony was inadmissible. However, given the fact that this testimony was apparently a surprise to the Hassoldts' counsel (because, according to the Hassoldts, Patrick had maintained throughout the litigation that it was involved in the billboard business), we believe the fairest way to handle the matter on retrial is to permit the Hassoldts any additional discovery they require in order to be in a position to refute Patrick's claim. Of course, if, as the Hassoldts contend, "Patrick sought to substitute another entity for itself solely for purposes of determining punitive damages," they should be permitted to prove that fact at trial. Moreover, if Patrick claims it has been succeeded by another business entity, the Hassoldts should be given the opportunity, if appropriate, to amend their complaint to add any successor entity as a defendant. If Patrick abandons any claim that it is no longer in the billboard business, all of this discovery will be unnecessary. In any event, given the difficulty experienced by the court and counsel with respect to the admissibility of evidence on the punitive damage issue, we strongly urge the trial court, before the trial begins, to make an in limine ruling with respect to the evidence that will be admitted on the issue of punitive damages.

V

THE HASSOLDTS HAD STANDING TO BRING A TRESPASS ACTION

Patrick claims it was deprived of the opportunity of proving the Hassoldts had no standing to bring a trespass action for the improper cutting of the

subject tree. Specifically, Patrick asserts it was denied the opportunity to prove that the Hassoldts did not have the requisite possessory interest for a trespass action because they had deeded the subject property to the Yankee Trust (the Hassoldts' trust), which in turn had leased the property to Der Kindergarden, Inc., a corporation—a nonparty to this action. Even if Patrick had been permitted to prove the foregoing facts, the conclusion that the Hassoldts did not have standing to bring a trespass action would not have been justified. It appears that the subject property is owned by the Hassoldts as trustees of the Yankee Trust, and that the Hassoldts are the beneficiaries of such trust. Under these circumstances, the Hassoldts could maintain an action in their own name, i.e., without mentioning the trust. (*McKoin v. Rosefelt* (1944) 66 Cal.App.2d 757, 768 [153 P.2d 55].)

Additionally, as owners of the property the Hassoldts had a right to maintain a trespass action, even if the property was leased to Der Kindergarden, Inc. ██ As explained in *Smith v. Cap Concrete, Inc.* (1982) 133 Cal.App.3d 769, 774-775 [184 Cal.Rptr. 308]: "The cause of action for trespass is designed to protect *possessory*—not necessarily ownership—interests in land from unlawful interference. [Citations.] . . . [¶] An action for trespass may technically be maintained only by one whose right to possession has been violated [citations]; however, an out-of-possession property owner may recover for an injury to the land by a trespasser which damages the ownership interest. [Citations.] In our view, the inquiry in a case involving unlawful intrusion on property rights should focus upon the nature of the injury and the damages sought: If the right to possession has been abridged and possessory rights damaged, the possessor may complain by way of an action for trespass; if, on the other hand, an intruder harms real property in a manner which damages the ownership interest, the property owner may seek recovery whether the cause of action be technically labeled trespass or some other form of action, such as waste."

We agree with the following position expressed by the Hassoldts: "In the instant case, it is fair to say that the possessory rights of the tenant corporation were interfered with when the defendants came onto the property to cut the tree—though this would not have involved a substantial period of time. The tenant corporation has also likely suffered some damage in that the tree on its leased premises is not now, and, during the balance of its tenancy, will not be, in the same condition as it was prior to the cutting. Therefore, theoretically, one could apportion some of the damage attributable to the cutting of the tree to the tenant. However, the real injury attributable to the cutting of the tree accrues to plaintiffs as the owners of the tree. They have

suffered a loss to their property interest from and after the cutting. Put simply, their property will never be the same."

VI

THE COURT ERRED BY FAILING TO GRANT A NONSUIT ON THE HASSOLDTS' CAUSE OF ACTION FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

█ In order to recover on a cause of action for intentional infliction of emotional distress, the conduct of the defendant must be "directed at the plaintiff, or occur in the presence of a plaintiff of whom the defendant is aware." (*Christensen v. Superior Court* (1991) 54 Cal.3d 868, 903 [2 Cal.Rptr.2d 79, 820 P.2d 181].) As Patrick correctly asserts "Plaintiffs were unquestionably not present at the time of the tree trimming incident, and thus, to recover, they must establish that PMG [Patrick] is guilty of extreme and outrageous conduct that was personally directed at them. On the existing evidence, Plaintiffs have not sustained this burden, and are simply unable to do so." We agree and order that the Hassoldts' cause of action for intentional infliction of emotional distress be dismissed.

Our ruling in no way affects the Hassoldts' right to recover for emotional damage based on their remaining causes of action. (*Kornoff v. Kingsburg Cotton Oil Co.* (1955) 45 Cal.2d 265, 272 [288 P.2d 507] ["[i]t appears to us that the discomfort and annoyance suffered by plaintiffs is an injury directly and proximately caused by defendant's invasion of their property and that such damages would naturally result from such an invasion."]; *Herzog v. Grosso* (1953) 41 Cal.2d 219, 225 [259 P.2d 429] ["[o]nce a cause of action for trespass or nuisance is established, an occupant of land may recover damages for annoyance and discomfort that would naturally ensue therefrom."].)[14]

VII

CONSIDERATIONS ON REMAND*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

[14]In *Merenda v. Superior Court* (1992) 3 Cal.App.4th 1, 9 [4 Cal.Rptr.2d 87] the court cited *Kornoff* and *Herzog* as illustrative of cases where "[r]ecovery also has been sanctioned for emotional distress which could be said naturally to ensue from an act which invaded an interest protected by an *established* tort."

*See footnote, *ante*, page 153.

# VIII

## DISPOSITION

The judgment is reversed. Each party is to bear its own costs on appeal.

Klein, P. J., and Croskey, J., concurred.

A petition for a rehearing was denied November 1, 2000.